UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAYMOND STROMINGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00437-JPH-TAB |
| | ) | |
| STEPHEN R. HILL, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT
STEPHEN R. HILL'S MOTION FOR SUMMARY JUDGMENT**

Raymond Strominger, an Indiana prisoner, brings federal and state claims
against Dr. Stephen R. Hill relating to treatment of his left eye. Dkt. 71.[1] Dr. Hill,
an optometrist who was previously contracted by Wexford to provide services at
Pendleton Correctional Facility, has filed a motion for summary judgment. Dkt.
118. For the reasons below, disputed material facts preclude Dr. Hill's motion
for summary judgment on the federal constitutional claim, while summary
judgment is appropriate on the state law claims.

**I.
Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way
of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment
is appropriate when there is no genuine dispute as to any of the material facts,
and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v.*

---

[1] Mr. Hill's claims against the other defendants were resolved with a Settlement
Agreement. Dkt. 85, 86.

*Middlebury Comm. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

## II.
## Factual Background

Because Dr. Hill has moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). After providing background facts, the remaining relevant facts are discussed chronologically.

### A. The Parties

At all times relevant to this lawsuit, Dr. Hill was a licensed optometrist in Indiana and a health care provider duly qualified under the Indiana Medical Malpractice Act. Dkt. 118-2 at 1; dkt. 118-3. Dr. Hill provided optometry services at the Pendleton Correctional Facility on a part-time basis under a contract with Wexford. Dkt. 118-2 at 1-2.

Mr. Strominger was a prisoner under the supervision of the Indiana Department of Correction and incarcerated at Pendleton Correctional Facility. Dkt. 118-1 at 6.

Mr. Strominger has not filed a complaint against Dr. Hill with the Indiana Department of Insurance and no medical review panel has issued an opinion. Dkt. 118-3 at 1-2.

### B. Outpatient Referral Process

Before a prisoner could receive outpatient treatment, the treatment had to be approved by an in-house provider employed by Wexford. Dkt. 118-2 at 2. As a contract optometrist, Dr. Hill could make recommendations or request that

3

someone be referred for additional treatment or examination for optometric-related services. *Id.*

To make an outpatient referral, Dr. Hill would fill out a request for an outpatient referral by identifying the facility and the problem, suggest a type of specialist, and then communicate to Wexford that the outpatient request for referral had been made. *Id.* Dr. Hill was not responsible for approval of outpatient referrals or scheduling outpatient visits. *Id.*

Dr. Hill is not aware of an urgent referral process. As part of his contract with Wexford, Dr. Hill completed both in-class and 20-hours of computer-based training and never was instructed as to how to initiate an "urgent" referral. Dkt. 133-1 at 1.

### C. February 2018

On February 23, 2018, Mr. Strominger woke up with rapid vision loss in his left eye. Dkt. 118-1 at 5. He could perceive only light out of that eye. *Id.* He sent in request for healthcare forms every week explaining his vision loss and pain until he was seen by Dr. Hill six weeks later. Dkt. 126 at ¶¶ 5, 17.

### D. April 2018

On April 6, 2018, Dr. Hill saw Mr. Strominger. Dkt. 118-4 at 1-2; Dkt. 118-2 at 3. During this visit, Dr. Hill told Mr. Strominger that he had not received any of Mr. Strominger's request-for-healthcare forms. Dkt. 126 at ¶ 6.

Mr. Strominger told Dr. Hill that he was in constant severe pain. *Id.* at ¶ 10. The parties dispute what happened during the visit. Dr. Hill testified that he performed a dilated fundus examination (DFE) at this appointment. Dkt. 118-2

at 3. A DFE is when the pupil is dilated to allow the examiner to look for abnormal changes in the back of the eye. *Id.* Dr. Hill noted that Mr. Strominger had light perception only in his left eye and that he was positive for diabetic retinopathy. *Id.* Mr. Strominger testified that Dr. Hill did not examine his left eye, dilate either eye, or check his intraocular pressures (IOP). Dkt. 126 at ¶¶ 7-9. Instead, after Mr. Strominger told Dr. Hill that he was diabetic, Dr. Hill told him that diabetic retinopathy was probably causing bleeding behind the eye and vision loss. *Id.* at ¶ 9. No medications were prescribed. *Id.* at ¶ 10.

As a result of his examination, Dr. Hill issued a referral for Mr. Strominger to be seen by an ophthalmologist for a diabetic retinopathy evaluation. Dkt. 118-2 at 3; dkt. 118-4 at 3-4.

On April 9, 2018, the outpatient referral request was approved by Wexford. Specifically, Dr. Ritz issued the approval after a call with Dr. Talbot. Dkt. 118-4 at 3-4.

On April 26, 2018, Mr. Strominger sent a request for health care directed to the "eye doctor" which Dr. Hill reviewed on May 4, 2018. Dkt. 118-4 at 5. Mr. Strominger asked whether the referral to be seen by an ophthalmologist had been approved. *Id.* Dr. Hill replied that he had not yet received a response and would re-issue the request soon if he received no response. *Id.*

**E. June 2018**

On June 4, 2018, Mr. Strominger saw Dr. Groves-Egan, an ophthalmologist, who found that Mr. Strominger's left eye pressure was extremely elevated. Dkt. 118-4 at 8 (noting "IOP too high" and that glaucoma and

5

retinal specialist referral needs to be scheduled "STAT"). Mr. Strominger reported that he could barely see light. *Id.* at 7. He was diagnosed with neovascular glaucoma, secondary corneal edema, ocular ischemic syndrome, and vitreous hemorrhage. *Id.* at 9. Dr. Goves-Egan's examination notes recommended a STAT glaucoma consultation, carotid dopplers, and referral for retinal evaluation. *Id.* at 6. She also suggested prescriptions for latanoprost, dorzolamide/timolol, brimonidine, and Diamox. *Id.* These medicines were intended to reduce Mr. Strominger's high IOP in his left eye. Dkt. 118-2 at 4. In addition, Dr. Groves-Egan issued three referral orders: 1) retinal specialist referral, schedule STAT, for vitreous hemorrhage, dkt. 125-1 at 7; 2) glaucoma referral, schedule STAT, for neovascular glaucoma, *id.* at 8; 3) imaging order for ocular ischemic syndrome, *id.* at 9.

On June 8, 2018, Dr. Hill reviewed the record of Mr. Strominger's visit with Dr. Groves-Egan. Dkt. 118-2 at 3. He noted from review of the record that Dr. Groves-Egan was concerned that carotid artery problems may be causing Mr. Strominger's unilateral high intraocular eye pressure in his left eye. *Id.* Dr. Hill made a referral request for Mr. Strominger to get a carotid doppler. *Id.*; dkt. 118-4 at 6. A carotid doppler measures the blood through the carotid arteries—the two main arteries which carry blood to one's head and neck. Dkt. 118-2 at 3. When blood flow through the carotid arteries is reduced or insufficient it can cause increased transient/permanent blindness in one eye. *Id.* at 3-4. A carotid doppler is a diagnostic test that may facilitate an understanding of the cause of, among other things, issues with vision. *Id.* at 4.

Dr. Hill testified that he did not prepare an outpatient referral for a glaucoma or retinal evaluation "STAT" because he believed the carotid doppler needed to be done prior to any further evaluation. *Id.* Dr. Hill prescribed the combination of medications recommended by Dr. Groves-Egan to reduce the high intraocular eye pressure in Mr. Strominger's left eye. *Id.*

On or about June 26, 2018, the carotid doppler was approved by Dr. Ritz after conversation with Dr. Talbot. Dkt. 118-4 at 15-16 (noting Ophthalmologist Groves-Egan, MD is concerned that carotid problems may have caused unilateral high intraocular eye pressure). A note from the Utilization Management Nurse for Wexford states that the physician or midlevel practitioner should be notified immediately if an appointment or service cannot be completed within 4 weeks. *Id.* at 16.

**F. July 2018**

The carotid doppler was scheduled for July 16, 2018, but it did not take place. *Id.* at 17.

On July 8, 2018, Mr. Strominger sent a request for health care asking whether the glaucoma or retinal specialist referrals ordered "STAT" by Dr. Groves had been approved. Dkt. 118-4 at 25. Dr. Hill responded on July 24, 2018, that "records show you should have been scheduled July 10, 2018, Did you go out?" *Id.* Someone with different handwriting further responded: "I have not got that scheduled yet. Misplaced paperwork. Faxed to Dr. T[illegible]." *Id.*

On July 25, 2018, Mr. Strominger directed a request for interview form to Ms. LaFlowers, the Healthcare Administrator. He stated:

> This is an effort to resolve this issue informally. Not having the 2
> different referral orders and 1 imaging order being approved by
> Wexford from Dr. Grove on 6/4/18. The 2 different referral orders,
> 1 for glaucoma specialist and 1 for retinal specialist both specifically
> state Urgency & Schedule within: STAT. It is now over 6 weeks since
> I seen Dr. Grove & I still haven't been seen by anyone. Please
> respond.

Dkt. 118-4 at 26. Someone from Wexford responded stating, "the referral was reviewed and approved. Scheduling office is wanting to hear back from Dr. Groves' office for additional information. Last update 7/25/2018." *Id.*

### G. September 2018

On September 26, 2018, Mr. Strominger filed a request for health care regarding seeing a glaucoma and/or retinal specialist. Dkt. 118-4 at 28. He wrote:

> I would like to know why I have not been seen by a Glaucoma and
> Rentinal Specialist that Dr. Groves referral was ordered back on
> 6/4/18, along with an imaging order from her. Ever since then I
> have got the "run around" regarding those orders. I still have not
> received my Timolol eye drops either … someone on the medical staff
> lied and said I refused an eye appointment in July and did receive
> my Timolol, which both did NOT occur. What's going on! I'm in
> constant pain from the high eye pressure for months now.

Dkt. 118-4 at 28.

In response, someone from Wexford wrote that they would check into whether there was an outside appointment and will have Dr. Hill check on drops. *Id.* And what appears to be a note attached to the same form, provides: "No upcoming outside [appointment]. Last thing was on 6/8/18 Dr. Groves. Carotid Doppler was refused 7/16/18. Nothing else done since." *Id.* (note dated 10/21/18).

### H. October 2018

On October 12, 2018, Dr. Hill updated Mr. Strominger's chart to reflect a possible need to revisit Dr. Groves-Egan for any prescription medications. Dkt. 118-2 at 4; dkt. 118-4 at 29-30. Dr. Hill noted that "Groves Rx is ... active until December: request sent to advise if [patient] does not have meds." Dkt. 118-4 at 29. This action was taken in response to Mr. Strominger's September 26, 2018, request for healthcare because he stated he had not received Timolol. Dkt. 118-2 at 4. As noted, someone from Wexford wrote that they would "have Dr. Hill check on drops." Dkt. 118-4 at 31. Dr. Hill added his response to the request for healthcare form by listing the medications Dr. Groves-Egan prescribed and stating, "If Mr. Strominger has run out please inform." *Id.*[2]

The carotid doppler was completed on October 22, 2018. Dkt. 118-4 at 32-33. The carotid doppler showed retrograde flow in the right vertebral artery which was indicative of possible subclavian steal syndrome. *Id.* at 32. The radiologist recommended a CT angiography (CTA) of the neck. *Id.*

On October 30, 2018, Mr. Strominger had a chronic care visit with Dr. Talbot. *Id.* at 34-38. Mr. Strominger indicated that he was willing to have a CTA of his neck completed as recommended by the radiologist. *Id.* at 34.

---

[2] Mr. Strominger takes issue with the fact that there are two versions of his Request for Healthcare form number 263157. *See* dkt. 118-4 at 28, compare with, *id.* at 31. But, it appears that the request was simply reviewed by multiple people and a copy was made during the course of the review.

**I. November 2018**

An outpatient referral was approved by Dr. Mitcheff on November 1, 2018, for Mr. Strominger to get a magnetic resonance angiography (MRA) of his neck after reviewing the radiologist's report. Dkt. 118-4 at 39.

On November 9, 2018, Dr. Hill reviewed a request for healthcare dated November 5, 2018. The request for health care stated:

> I had my carotid artery imaging order from Dr. Groves finally done on 10/22/18. So when am I going to have my referral orders from Dr. Groves for a glaucoma specialist & a retinal specialist done?? Have even either one or both of them been submitted for referral yet? Dr. Groves ordered them back on 6/4/18 & stated – "schedule within: STAT." Please respond. This needs to be taken care of. I'm in constant pain & can't see.

Dkt. 118-4 at 40. In response, Dr. Hill stated, "I have no experience in reading imaging. However, I have made Dr. Talbot, MD aware of this deficiency." *Id.*

On November 16, 2018, Mr. Strominger underwent an MRA of his neck which was negative. *Id.* at 41-43. The provider consultation report was signed by Dr. Talbot. *Id.* at 43.

**J. December 2018**

On December 28, 2018, Dr. Hill entered a consultation report in Mr. Strominger's medical record. Dkt. 118-4 at 47. He noted that Mr. Strominger had "unilateral high IOP and vision loss." *Id.* He issued a request for an outpatient referral for Mr. Strominger to be seen by Dr. Groves-Egan. *Id.* at 44-48. He commented, "Dr. Groves originally suspected Carotid Artery Blockage[] and gave Rx for only short run of glaucoma meds, she may wish to change the glaucoma meds." *Id.* at 46.

**K. January 2019**

On January 2, 2019, Mr. Strominger wrote a request for interview form to Dr. Hill stating that his issue is with waiting until December 28, 2018, to request a consultation for a glaucoma evaluation over six and a half months after an ophthalmology specialist had ordered a referral to be scheduled within "STAT" on June 4, 2018, resulting in his continued pain. Dkt. 125-1 at 12. In response, someone with handwriting and signature unique from Dr. Hill wrote, "will schedule next week 1-18-19." *Id.*

Dr. Hill's request for an outpatient referral for Mr. Strominger was denied by Dr. Mitcheff on January 7, 2019. Dr. Mitcheff questioned why the onsite optometrist is unable to treat the patient. Dkt. 118-4 at 49.

On January 11, 2019, Mr. Strominger met with Nurse Practitioner Elaine Purdue from Wexford for a chronic care visit. Dkt. 118-4 at 50-54. Mr. Strominger inquired with NP Purdue regarding a glaucoma evaluation since Dr. Hill's outpatient referral was denied. *Id.* NP Purdue indicated she would email the medical doctor and optometrist about it. *Id.* at 51.

That same day, Mr. Strominger sent a request for health care form to Dr. Hill stating:

> I seen in my file that last week they requested more info from you regarding the Glaucoma Eval Consultation you requested back on 12/28/18 – So please keep me informed on what is going on. This needs to be done because something needs to be done about the constant pain I am having in my left eye from the high pressure in it. Thanks.

Dkt. 125-1 at 16. Dr. Hill responded on January 18, 2019, "Today I requested you to see a specialist in Glaucoma - Dr. Martin at IU Health. I emphasized this

is not a typical case of glaucoma." *Id.* That same day, Dr. Hill updated Mr. Strominger's chart to reflect his recommendation that Dr. Martin evaluate his unilateral high IOP with pain because it is not responding to usual glaucoma medications. Dkt. 118-4 at 56.[3] *Id.*

On January 20, 2019, Mr. Strominger sent another healthcare request form that was directed to Dr. Hill. Mr. Strominger asked whether the request for a consultation for a glaucoma evaluation submitted on December 28, 2018, was approved. Dkt. 125-1 at 17. Dr. Hill responded that he reissued the request asking that Mr. Strominger be seen by the specialist Dr. Groves-Egan recommended and gave Wexford the name and number of Dr. Elizabeth Martin, MD. Dr. Hill further noted that Wexford had acknowledged this request. *Id.*

On January 28, 2019, Dr. Pierce approved the request for Ophthalmology follow-up finding that Dr. Groves-Egan may wish to change Mr. Strominger's glaucoma medications. *Id.* at 49; dkt. 118-2 at 5.

**L. March 2019**

On March 11, 2019, Mr. Strominger was again evaluated by Dr. Groves-Egan. Dkt. 118-4 at 57-60. Dr. Groves-Egan noted that his intraocular pressure had dropped but there was minimal improvement in that regard. *Id.* at 60. She noted the carotid doppler was normal. She wrote, "still needs to see retina [specialist], this was recommended in June. Needs retina referral to eval for

---

[3] Elizabeth A. Martin, MD is an ophthalmologist at IU Health Physicians and Assistant Professor of Clinical Ophthalmology at Indiana University School of Medicine with a specialty in glaucoma. See Dr. Martin's biographies at https://iuhealth.org/find-providers/provider/elizabeth-a-martin-md-60831 and https://medicine.iu.edu/faculty/42148/martin-elizabeth.

cause of vision loss L eye." *Id.* at 57. She further recommended continuing the prescriptions medications to reduce intraocular eye pressure. *Id.*

On March 15, 2019, Dr. Hill reviewed the record from Dr. Groves-Egan's March 11 visit with Mr. Strominger. *Id.* at 57-66; dkt. 118-2 at 5. After reviewing the record, Dr. Hill issued a request for a referral to a retinal specialist. Dkt. 118-2 at 5; Dkt. 118-4 at 65. This referral was approved by Dr. Mitcheff after communicating with Dr. Talbot. Dkt. 118-4 at 65.

### M. April 2019

Mr. Strominger was transferred to the Indiana State Prison in early April. Dkt. 118-1 at 17.

On April 25, 2019, Mr. Strominger saw Dr. Frank Hrisomalos from Midwest Eye Institute for his left eye vision. Dkt. 118-4 at 70-71. Dr. Hrisomalos noted there was no evidence of retinal tear or detachment. He recommended ocular medications and an injection as well as a glaucoma follow-up. *Id.* at 71. He diagnosed Mr. Strominger with neovascular glaucoma. *Id.*

### N. June 2019

On June 7, 2019, Dr. Dennis Lewton, an optometrist at the Indiana State Prison, noted that Mr. Strominger's intraocular pressure was 52 and recommended an outpatient referral for a glaucoma specialist due to uncontrolled eye pressure. Dkt. 118-4 at 73. Dr. Mitcheff approved the glaucoma consult. *Id.* at 74.

### O. August 2019

On August 29, 2019, Mr. Strominger saw Dr. Hemang Patel from Midwest Eye Institute. Dkt. 118-4 at 75. Dr. Patel assessed Mr. Strominger with end stage nerve damages in his left eye. *Id.* at 76. Dr. Patel recommended that he continue with all prescription medication. He also recommended a diode laser procedure. *Id.*

### P. September 2019

On September 10, 2019, Dr. Mitcheff approved glaucoma laser surgery for Mr. Strominger. Dkt. 118-4 at 77.

### Q. December 2019

On December 4, 2019, Mr. Strominger underwent laser surgery with Dr. Patel which successfully reduced the pressure and stopped the pain associated with it in his eye. Dkt. 118-1 at 17-18. Mr. Strominger has complete vision loss in his left eye. Dkt. 118-1 at 17.

### III.
### Discussion

Mr. Strominger alleges that the medical care Dr. Hill provided violated his rights under the United States Constitution and Indiana law. First, he asserts that Dr. Hill was deliberately indifferent to his vision loss and left eye pain as evidenced by the fact that he failed to timely refer Mr. Strominger to a retinal and glaucoma specialist as directed by the ophthalmologist. Dr. Hill argues that he was not deliberately indifferent to Mr. Strominger's medical needs and that he responded appropriately believing that a cartoid doppler test was necessary prior to requesting an evaluation by a retinal or glaucoma specialist. In addition,

Mr. Strominger alleged state law claims of malpractice and intentional infliction of emotional distress. Dr. Hill argues without contradiction from Mr. Strominger that those claims are not properly before the Court.

The federal claims are discussed first, followed by a discussion of the state law claims.

### A. Eighth Amendment Claim

The Supreme Court recognized in *Estelle v. Gamble*, that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." 429 U.S. 97, 103 (1976) "In light of this, the Court held that the State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated." *West v. Atkins*, 487 U.S. 42, 54 (1988).

### 1.   Standard of Review

"Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

Dr. Hill does not dispute that Mr. Strominger's vision loss and related eye pain constitutes a serious medical condition. Dkt. 119 at 13-16. To survive

summary judgment then, Mr. Strominger must show that Dr. Hill acted with deliberate indifference—that is, that he consciously disregarded a serious risk to his health. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016).

"A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a subjective test: "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Id.*; *Petties*, 836 F.3d at 728. "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (internal citations omitted). The Seventh Circuit has "held that a jury can infer deliberate indifference when a treatment decision is 'so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.'" *Id.* (quoting *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006)).

A prison official may be deliberately indifferent if he or she persists in a course of treatment known to be ineffective, chooses an easier or less efficacious course of treatment, or there are "inexplicable delays" in treatment. *Pettis v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain." *Perez v. Fenoglio*, 792 F.3d 768, 777–78 (7th Cir. 2015).

16

### 2. Material Facts in Dispute

On April 6, 2018, Mr. Strominger presented to Dr. Hill with rapid vision loss which began on February 23, 2018. Dkt. 127 at 5-6. Dr. Hill concluded from Mr. Strominger's medical history and symptoms that the cause of the problem was diabetic retinopathy. Dkt. 127 at 6-7. Dr. Hill immediately sent an outpatient referral request for Mr. Strominger to be seen by an ophthalmologist for a diabetic retinopathy evaluation. Dkt. 118-4 at 1-2; Dkt. 118-2 at 3; Dkt. 133 at 2.

Following an examination on June 4, 2018, Dr. Groves-Egan, an ophthalmologist, ordered three referrals, but Dr. Hill only requested one. Specifically, she ordered an evaluation by a retinal specialist and a glaucoma specialist immediately, but Dr. Hill only pursued the non-urgent referral for an ultrasound of the carotids. Dkt. 127 at 8. A reasonable jury could conclude that Dr. Hill understood the specialist's orders but failed to immediately refer Mr. Strominger for an evaluation by a retinal specialist and a glaucoma specialist and instead only pursued a referral for the carotid doppler test. "A prison doctor's refusal to follow a specialist's orders may evince deliberate indifference." *Hubbard v. Mitcheff*, No. 22-1578, 2022 WL 17369687, at *2 (7th Cir. Dec. 2, 2022) (citing *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)). A jury could further conclude that the failure to make the additional referrals delayed Mr. Strominger's access to a qualified specialist and lead to prolongation of pain.

In addition, even if Dr. Hill believed a carotid doppler test was necessary before seeking additional treatment from a specialist, he did not refer Mr.

Strominger to the retinal specialist and a glaucoma specialist immediately after the carotid doppler test was completed on October 22, 2018. Instead, when Dr. Hill finally submitted another referral request for Mr. Strominger it was to be seen by Dr. Groves-Egan once again, the same doctor who had already ordered the evaluation by the retinal and glaucoma specialists, further delaying his care. Dkt. 127 at 9. Mr. Strominger was sent back to Dr. Groves-Egan on March 11, 2019. Dkt. 118-4 at 55-56. She again recommended Mr. Strominger be seen by a retinal specialist and to continue the prescription medications to reduce his intraocular eye pressure. It was not until March 15, 2019, (284 days after Dr. Groves-Egan first ordered an evaluation by a retinal specialist) that Dr. Hill issued an outpatient referral to be seen by a retinal specialist. Dkt. 118-2 at 5; Dkt. 118-4 at 65.

In conclusion, a reasonable jury could conclude that Dr. Hill was deliberately indifferent to Mr. Strominger's painful eye condition because he failed to communicate through the referral process that Mr. Strominger needed urgent attention and failed to follow the ophthalmologist's instructions to schedule an evaluation by a retinal specialist and glaucoma specialist "STAT." *Hubbard,* 2022 WL 17369687, at *2. A reasonable jury could similarly conclude that he persisted in an ineffective course of treatment by submitting a second referral to Dr. Groves-Egan, when she had already specifically ordered an evaluation by a glaucoma and retinal specialist. *Pettis*, 836 F.3d at 729–30. These actions resulted in a delay of treatment which unnecessarily prolonged Mr. Strominger's pain. *Perez*, 792 F.3d at 777–78. "[W]hen a doctor is aware of

18

the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022) (quoting *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020)).

Given the evidence in the summary judgment record, a reasonable jury could find that Dr. Hill was deliberately indifferent to Mr. Strominger's serious medical needs in violation of the Eighth Amendment rights. Accordingly, the motion for summary judgment on this federal claim is **DENIED.**

### B. State Law Claims

Dr. Hill argues that the state law claims should be dismissed for lack of subject matter jurisdiction. Dkt. 119 at 17. Mr. Strominger does not challenge this argument.

Under the Indiana Medical Malpractice Act, Ind. Code § 34-18-1 et seq., "before a party may commence a medical malpractice action against a health care provider in an Indiana trial court, the party's proposed complaint must first be presented to a medical review panel through the Department of Insurance, and the panel must render an opinion as to whether the defendant failed to act within the appropriate standard of care." *Welborn v. Ethicon Inc.*, No. 2:22-CV-92-PPS-JPK, 2022 WL 17600302, at *1 (N.D. Ind. Dec. 12, 2022) (quoting *Lorenz v. Anonymous Physician #1*, 51 N.E.3d 391, 395–96 (Ind. App. 2016) (citing Ind. Code § 34–18–8–4, § 34–18–10–22)). Thus, until a medical review panel has issued its opinion, the trial court has no jurisdiction to hear and adjudicate the claim. *Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App.

19

2014); *B.R. ex rel. Todd v. State*, 1 N.E.3d 708, 713 (Ind. Ct. App. 2013) ("simply said, the Act grants subject matter jurisdiction over medical malpractice actions first to the medical review panel, and then to the trial court.").

Mr. Strominger's claims of negligence and intentional infliction of emotional distress against Dr. Hill arise from the medical care (or lack of medical care) Dr. Hill provided. As such these claims are in substance a claim for medical malpractice. "[R]egardless of what label a plaintiff uses, claims that boil down to a question of whether a given course of treatment was medically proper and within the appropriate standard are the quintessence of a malpractice case." *Howard Regional Health System v. Gordon*, 952 N.E.2d 182, 186 (Ind. 2011) (internal citations and quotations omitted).

Because Dr. Hill is and was a health care provider duly qualified under the Indiana Medical Malpractice Act and Mr. Strominger has not filed a complaint with the Indiana Department of Insurance, the state law claims against Dr. Hill are dismissed for lack of subject matter jurisdiction. *B.R. ex rel. Todd*, 1 N.E.3d at 713.

## IV.
## Conclusion

Defendant Hill's motion for summary judgment is **GRANTED in part and DENIED in part.** Dkt. [118]. Defendant Dr. Hill is not entitled to judgment as a matter of law on the Eighth Amendment deliberate indifference claim. This claim shall be resolved through a settlement or trial. Summary judgment is granted on the state law claims, which are dismissed for lack of subject matter jurisdiction.

No partial final judgment shall issue at this time.

**SO ORDERED.**

Date: 5/1/2023

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RAYMOND STROMINGER
160814
INDIANA STATE PRISON
INDIANA STATE PRISON
Inmate Mail/Parcels
One Park Row
MICHIGAN CITY, IN 46360

All Electronically Registered Counsel